**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| WAM FAM5, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 15-1195 |
| | ) | |
| NOVA CASUALTY INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER AND OPINION

This matter is now before the Court on Defendant's Motion [19] for Summary Judgment, Defendant's Motion [25] for Sanctions, and Defendant's Motion [27] to Strike Response to Motion. For the reasons set forth below, Defendant's Motion [19] for Summary Judgment is GRANTED IN PART AND DENIED IN PART, Defendant's Motion [25] for Sanctions is DENIED, and Defendant's Motion [27] to Strike is DENIED.

### BACKGROUND

Plaintiff, WAMFAM5 ("WAM"), brought this action against Defendant, Nova Casualty Insurance Company ("Nova"), after Nova denied coverage under a property insurance policy ("the Policy") issued in July 2012 to WAM for the property situated at 105 North Main Street, Georgetown, Illinois. WAM, through its owner and managing partner Larry Wampler, purchased the property in 2007 from Mark Dust.[1] The property included two buildings joined by a common masonry wall, which the Parties refer to as the east building and the west building. WAM operated a Subway restaurant in the west building, but never used the vacant east building, which

---

[1] Although Plaintiff does not dispute Defendant's assertion that Wampler purchased the property in 1997, the record indicates that Wampler purchased the building in 2007. *Cf.* Doc. 19, ¶ 4, *with* Doc. 19-2, at 3-4.

the prior owner purchased so customers could use the parking lot adjacent to the Subway restaurant. Mr. Dust never went to the second floor of the east building and only entered the east building a few times during his ownership. Mr. Dust repaired the roof on the west building, but did not perform any maintenance on the roof or any other portion of the east building. Similarly, Wampler never walked into the east building and the windows and doors were boarded up. WAM did not perform any maintenance on the east building, and Wampler does not recall performing any major maintenance at the premises prior to the incident.[2] Doc. 19, ¶¶ 1-13, Doc. 24, ¶ 12.

In the winter of 2012, Wampler asked WAM's contractor and owner of Illinois Valley Construction, Kent Seeman, to inspect the west building's chimney. At the inspection, Seeman could see from the ground that all of the chimney's tuckpointing was gone and the chimney was deteriorating and leaning. However, Seeman was uncertain whether Wampler knew that the east building's chimney was leaning. The parties dispute whether Seeman informed Wampler that the chimney needed to be removed. Doc. 19, ¶¶ 14-19, Doc. 24, ¶¶ 14, 17.

After a storm on April 19, 2013, a WAM employee received a call from the fire department notifying WAM that there was damage to the exterior of the east building. Thereafter, Wampler asked Seeman to inspect the damage to the premises. Seeman opined that the east building had been abandoned and the floor was gone because the floor joists were pulling away from the wall.[3] Seeman also explained that the floor joists were likely coming out of the wall in the east building before the April 19, 2013 incident. During a post-loss inspection Seeman noted

---

[2] Plaintiff asserts that roofs of both buildings were inspected approximately one to two years prior to the April 19, 2013 incident. Seeman testified that he inspected the chimney in 2012 from the ground because he did not have a ladder with him, and Wampler never asked him to inspect the roof. See Doc. 24-4, at p.7, 9-10, 17.

[3] Plaintiff disputes that Seeman opined that the east building had been abandoned *as a result of* the fact that the floor joists were starting to pull away from the wall. Doc. 24, ¶ 22.

that the roof of the east building exhibited wear and tear,[4] and opined that water could enter the building through the roof because the roof "wasn't in good shape."[5] During the post-loss inspection, Seeman could see signs of prolonged water intrusion and distress in the building. On May 21, 2013, WAM retained Dale Peek to serve as its public adjuster. Peek also inspected the building after the loss and saw decay and cracking on the roof. The parties dispute whether Wampler had informed Peek of brick decay on the chimney prior to the incident. Doc. 19, at ¶¶ 20-29, 47-50, Doc. 24, at ¶¶ 20-29.

WAM notified Nova of the loss, and Nova informed Wampler on April 26, 2013 that it would be necessary for Nova to conduct an investigation to determine the cause of the loss and to inspect the premises. As part of the inspections, Nova, through a third-party claims administrator, retained structural engineer Michael Cahill of SEA, Ltd. to inspect the premises on April 26, 2013 and May 28, 2013. Cahill opined that the east building was vacant at the time of the loss and that the extensive deterioration of the ceiling tile and ceiling grid in the east building was indicative of long term moisture exposure and a lack of periodic maintenance on the roof for several years. During his inspection, Cahill was able to observe light from the sky visible through slits in the roof from the second floor of the east building. Cahill also observed extensive deterioration of the covering of the roof of the east building in the form of cracking and openings on the surface. The roof covering was missing entirely along the east exterior wall of the building, revealing discolored roof sheathing. Cahill opined that the openings and missing sections of the roof coverings allowed a large number of sources of moisture intrusion into the

---

[4] Plaintiff disputes this fact inasmuch as Seeman also testified that, prior to the loss, the floor joists of the east building were not "that bad" and that he "walked the roof" of the east building "with confidence." Doc. 24, at ¶¶ 23-24.

[5] Plaintiff disputes this fact because the statement about the roof's condition was made after, rather than before, the roof collapsed. *Id.* at ¶ 25.

building, and the lack of periodic maintenance, holes in the roof, and missing sections of roof covering would have been readily apparent to anyone who inspected the roof. Doc. 19, at ¶¶ 30-42, Doc. 24, at ¶¶ 30, 36-42.

Based on his inspections, Cahill concluded that: (1) the cause of the failure of the second floor and roof joists in the east building was long-term moisture-related deterioration of structural members; (2) the failure of the chimney and adjacent parapet resulted from the failure of the roof framing members and lack of periodic maintenance; (3) the staining of the second floor of the west building and common wall adjacent to the restaurant, the fungal growth on the stairway basement walls, and the standing water in the basement were consistent with long-term moisture presence that pre-dated the April 19, 2013 incident; and (4) indications of the long-term moisture intrusion, resulting in the damage to the premises, would have been readily apparent to anyone who accessed the associated areas of the buildings. Doc. 19, at ¶¶ 43-46.

**LEGAL STANDARD**

Summary judgment is appropriate where the movant shows, through "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations … admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. In resolving a motion for summary judgment, "[t]he court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). In order to withstand a motion for summary judgment, the nonmovant must "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). When presented with a motion for summary judgment, the Court must

4

construe the record "in the light most favorable to the nonmovant and avoid[] the temptation to decide which party's version of the facts is more likely true." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).

"In order to withstand a motion for summary judgment in a lawsuit involving an insurer's failure to pay a claim under an all-risk insurance policy, the insured bears the initial burden of presenting, through the papers on file, sufficient facts establishing a *prima facie* case." *Johnson Press of Am., Inc. v. Northern Ins. Co. of N.Y.*, 339 Ill. App. 3d 864, 871 (1st Dist. 2003) (citing *Wallis v. Country Mutual Ins. Co.*, 309 Ill. App. 3d 566, 570 (2d Dist. 2000)). In order to establish a *prima facie* case, the insured must show that "(1) a loss occurred, (2) the loss resulted from a fortuitous event, and (3) an all-risk policy covering the property was in effect at the time of the loss." *Id*. If the insured establishes a *prima facie* case, the burden "then shifts to the insurer to show that the loss resulted from a peril expressly excluded from coverage." *Id*. (citing *Wallis*, 309 Ill. App. 3d at 570). Illinois courts "liberally construe any doubts as to coverage in favor of the insured, especially when the insurer seeks to avoid coverage based on an exclusion to the policy." *Id*. (citing *Yamada Corp. v. Yasuda Fire & Marine Ins. Co.*, 305 Ill. App. 3d 362, 371 (2d Dist. 1999)).

**ANALYSIS**

*(1) Whether WAM Sustained a Fortuitous Loss*

Defendant's motion for summary judgment first asserts that WAM cannot establish that it sustained a fortuitous loss. A fortuitous event is one that happens by chance or accident, or occurs unexpectedly or without known cause. *Johnson Press of Am.*, 339 Ill. App. 3d at 872. "The determination of whether a loss is fortuitous is a legal question for the court to determine." *Id*. (citing *Mattis v. State Farm Fire & Cas. Co.*, 118 Ill. App. 3d 612, 621 (5th Dist. 1983)). "A

loss that was, so far as the parties knew, an inevitable certainty at the time of contracting is not fortuitous and will not be covered by the resulting contract." *Id*. (citing *Crete-Monee Sch. Dist. 201-U v. Indiana Ins. Co.*, No. 96C-0275, slip op. at *4, 2000 WL 1222155 (N.D. Ill. 2000)). Nova argues that under *Johnson Press*, WAM's loss was not fortuitous. WAM argues that the instant case is more comparable to *Gulino*. Therefore, a review of those cases is in order.

*(a) Johnson Press of America, Inc. v. Northern Insurance Company of New York*

In *Johnson Press*, the plaintiff purchased a property insurance policy from the defendant providing coverage for two warehouses joined by a common masonry wall. Without any interference from natural forces, potions of the roof, the second floor, and the first floor of the older brick building collapsed into the basement and rendered the common masonry wall unstable. Plaintiff filed a claim for damages caused by the roof's collapse, and defendant retained an independent claims adjuster to assess the damage. Defendant also retained an architectural and structural engineering firm to assist in assessing plaintiff's insurance claim and file a report. Thereafter, plaintiff retained an engineering firm to review the defendant's expert report. *Id*. at 866. Both Plaintiff's and Defendant's experts opined that the result of the collapse was due to long-term deterioration and water infiltration. *Id*. at 872. The insurance policy covered the building against loss by certain fortuitous events, and excluded from coverage loss or damage caused by wear and tear, rust, decay, deterioration, and prolong water damage, and faulty or inadequate maintenance. *Id*. at 867.

The parties moved for summary judgment, and the trial court granted summary judgment in favor of the defendant. The trial court reasoned that, "[b]ased on the reports and testimony of the experts retained by the litigants," there was no dispute of material fact that "the roof's collapse was caused by long-term deterioration and water infiltration." *Id*. The Illinois appellate

court affirmed, reasoning that the loss was expressly excluded from the policy, and also finding

that plaintiff had not established a *prima facie* case:

> In this case, [defendant's expert] reported that, prior to the collapse, portions of the roof and second and first floors were missing. The stairwell to the first and second floors was partially collapsed. He further observed that there was fungal growth on the beams. There were severe water stain marks on the roof beams and columns. There was water dripping in the basement and water damage on the walls of the building. Defendant's expert [claim adjuster] also concluded that the collapse was the result of long-term decay due to plaintiff's failure to maintain the roofing of the building. Even plaintiff's expert, Shefee Lulkin, testified that the collapse was due to long-term deterioration and water infiltration. The dilapidated condition of the building demonstrates that the collapse of the building did not happen by chance or accident. It was expected. Since plaintiff failed to establish a *prima facie* case that the loss was due to a fortuitous event, the insurer is not liable.

*Johnson Press*, 339 Ill. App. 3d at 872.

*(b) Gulino v. Economy Fire and Casualty Company*

WAM argues that the instant case is more comparable to *Gulino* than *Johnson Press*. In

*Gulino v. Economy Fire and Casualty Company*, the plaintiff purchased an all-risk homeowner's

insurance policy from defendant that covered "sudden and accidental direct physical loss or

damage to property," subject to certain exclusions. 2012 IL App (1st) 102429, 971 N.E.2d 522,

524 (2012). The policy provided that the defendant would pay for "sudden and accidental direct

physical loss to covered property including the entire collapse of a building or any party of a

building cause by 'certain perils,' including 'weight of contents.'" *Id*. Under the policy,

"collapse" was defined as "an abrupt falling down or caving in of a building or any part of a

building. Collapse does not include settling, cracking, sagging, bowing, bending, leaning,

shrinking, bulging or expansion. A building or any part of a building that is in danger of falling

down or caving in is not considered to be in a state of collapse." *Id*. The policy excluded from

coverage the insured's "neglect to use all reasonable means to save and preserve property at and after the time of a loss, or when property is endangered by a peril insured against." *Id.*

Plaintiff filed a claim with defendant after noticing that the heat was not working and the basement was filled with several inches of water from a pipe above the washing machine. *Id.* at 525. When a plumber inspected the property, he found excessive amounts of paper and debris piled throughout the residence. The village of Wilmette had the water turned off, posted a notice that the building was dangerous and uninhabitable, and retained an architect to inspect the property. The architect found several thousand pounds of paper and debris on the first floor of the home. The defendant acknowledged that plaintiff sustained a water loss and paid for water damage in the basement area, but denied plaintiff's structural damage claim on the grounds that the loss was not a "collapse" under the policy and plaintiff "neglected to use reasonable means to preserve the property when endangered by a potentially covered loss." *Id.*

In his complaint, the plaintiff alleged that the loss occurred after the basement ceiling "suddenly sagged," causing the heating system to fail and the water pipes to freeze and flood the basement. The defendant's answer asserted an affirmative defense that plaintiff's alleged structural damage loss resulted from sagging, bowing, or bending floor joists, and was not the result of a "collapse" under the policy. Defendant further alleged that the excessive quantities of debris accumulating on the property indicated that plaintiff failed to use all reasonable means to save and preserve the property. *Id.* In plaintiff's deposition, he asserted that the piles of paper and debris accumulated over a period of five years or less, and that the photographs from the architect did not accurately depict the actual amount of material on the floor. *Id.* at 525-26.

The architect testified in a deposition for the defense that the property was neglected, noting the piles of papers on the first floor stacked six to seven feet high. He also testified that

the load on the first floor from the debris was over 400 pounds per square foot, well above the 60 pounds a standard home is designed to withstand. The architect also noticed that the floor joists were bending and bowing and had been pulled off their beam bearings, and opined that "the integrity of the structure had been compromised by the heavy loading of all the papers stacked above." *Id*. at 526. In a counter-affidavit submitted in response to defendant's motion for summary judgment, plaintiff stated that he did not notice any "settling, cracking, breaking, bending, bowing, bulging or expanding" of the basement ceiling prior to the loss. He further stated that the affected joists were located in an area close to the front door, which at the time of the incident was only occupied with small amounts of paper and a light desk. *Id*.

The trial court granted summary judgment in favor of defendant, reasoning that plaintiff would be unable to make a *prima facie* showing that defendant breached the contract because of, *inter alia*, neglect. *Id*. at 527. On appeal, the defendant asserted that plaintiff failed to show his loss resulted from a "collapse" under the policy, and that the loss was not fortuitous or unexpected because plaintiff's hoarding caused the floor joists to bow and bend over time. *Id.* at 528. The appellate court disagreed, and found that a material issue of fact existed as to the cause of the loss:

> In determining that [plaintiff] failed to establish a *prima facie* case, the trial court clearly did not find him to be a credible witness. The court stated: "[Y]our position is that [the weight] is less and it would have no bearing whatsoever on the loss sustained because it all of a sudden occurred absent this stuff? The weight has nothing to do with the loss, right? That is what you want the court to accept?" However, the purpose of a motion for summary judgment is to determine whether a triable question of fact exists, not to try a question of fact. The trial court cannot make credibility determinations or weigh the evidence at the summary judgment stage.
>
> *Gulino v. Econ. Fire & Cas. Co.*, 2012 IL App (1st) 102429, ¶ 25, 971 N.E.2d 522, 529–30 (internal citations omitted).

*(c) Applying Johnson and Gulino to the Instant Case*

Nova's motion for summary judgment argues that WAM did not suffer a fortuitous loss because no maintenance was performed on the roof in over fifteen years, Seeman told Wampler that the chimney needed to be removed, and Wampler told Peek the chimney had decayed prior to the loss. Doc. 19, at 16. Nova argues that this case is indistinguishable from *Johnson Press*, and that the dilapidated condition of the building did not happen by chance or accident. However, Nova's argument fails to consider that WAM's loss occurred during a storm. Thus, the instant case is distinguishable from *Johnson Press*, where "there was no storm in [the] area to precipitate the collapse of the roof." *Johnson Press*, 339 Ill. App. 3d at 873. Moreover, in *Johnson Press*, the plaintiff's *own expert* testified that "the collapse was due to long-term deterioration and water infiltration." I*d*. at 872.

Nova relies on Kent Seeman's deposition testimony to establish that WAM knew the chimney was deteriorating. See Doc. 19, at 4. To be sure, Seeman initially stated that Wampler "asked if I would drive down and look at a chimney that was starting to, they were starting to have some, it was leaning or something … They were worried about it falling on the next building or something, so they wanted me to go down and see if I could do anything with it." Doc. 19-5, at 4. However, Seeman later equivocates:

> Q. Okay. Let me ask, did you tell Larry that the chimney needed to be removed?
> A. No. I told him that we could remove it if he chose to do that.
>                                         * * *
> Q. Did he ask you if you could repair the chimney?
> A. He did ask if I could, he just wanted me to go down and get my opinion on it. And I told him that that I felt like he'd be money ahead if we went ahead and removed it. We could remove it but I didn't say that he needed to remove it.

> *Id*. at 4-5.

Nova also states that Wampler told Peek the chimney had decayed prior to the loss. Doc. 19, at

16. Peek testified to the following in his deposition:

> Q. Do you know if Mr. Wampler had any of those [superstructure] components
> inspected during his ownership of the building?
> A. Per this reference in my e-mail dated May 31, 2013, he mentioned—I had
> asked him if there was anyone that had forewarned him about the prospect and he
> said there wasn't other than noticing brick decay on the chimney. He thought the
> building—he thought it was holding its position. And he does not remember
> having a building inspection done.

> Doc. 19-4, at 52.

However, when asked in his deposition whether he noticed brick decay on the chimney, Wampler

testified that:

>  I noticed, as I said earlier, I noticed to me it was like the paint chipping or
> whether it was decay or not. That's what I was talking about before. That's
> elevated up high. I just remember taking a look at it. That's when I said we would
> call in Kent Seeman and I believe I was told that he went in and checked it out.
> But I was told he went in there and checked it out and said it was fine.

> Doc. 24-1, at 23.

Thus, unlike *Johnson Press*, where plaintiff's own expert admitted that the loss was caused by an

excluded peril, viewed in the light most favorable to WAM as the nonmovant, a material dispute

of fact exists as to the cause of the collapse. See *Gulino*, 971 N.E.2d at 528 ("Generally, the

question of whether a loss is fortuitous is a legal one for the courts to determine … However, the

determination of what occurrence caused the loss is one of fact, and if a genuine issue of material

fact exists, summary judgment is not appropriate.").

*(2) Whether the "Known-Loss" Doctrine Precludes Coverage*

Under Illinois law, "[i]f the insured knows or has reason to know, when it purchases a

CGL policy, that there is a substantial probability that it will suffer or has already suffered a loss,

the risk ceases to be contingent and becomes a probable or known loss." *Outboard Marine Corp.*

*v. Liberty Mut. Ins. Co.*, 154 Ill. 2d 90, 104, 607 N.E.2d 1204, 1210 (1992). In other words, "[w]here the insured has evidence of a probable loss when it purchases a CGL policy, the loss is uninsurable under that policy (unless the parties otherwise contract)" because the "risk of liability is no longer unknown." *Id*. at 103. However, "[t]here is no bright-line test to determine whether and at what point in time the insured knew or had reason to know of the substantial probability of the loss at issue," and "[t]he extent of the insured's knowledge of the loss must be determined on a case-by-case basis." *Id*. at 104. Thus, summary judgment is only appropriate only when no "factual questions exist with respect to the insured's knowledge at the time it bought [the] policy." *Id*.

Nova asserts that WAM's claim is barred by the "known-loss" doctrine because Wampler knew that the chimney had deteriorated in the "winter of 2012," and was thus aware that the chimney was leaning and deteriorating before Nova issued the Policy on July 29, 2012. In response, WAM argues that a material issue of fact exists as to whether Wampler knew that the east building's chimney had deteriorated prior to the loss. Doc. 19, at 17; Doc. 24, at 15.

Here, summary judgment against WAM is inappropriate for two reasons. First, as discussed above, a material dispute of fact exists as to the cause of the collapse. See *Gulino*, 971 N.E.2d at 528. It is axiomatic that in order for the known loss doctrine to preclude coverage, the actual cause of the loss must first be known. From the record, it is impossible to determine whether the collapse occurred solely from a windstorm, solely from decay, or whether the causes were concurrent. Second, a material dispute of fact exists as to when WAM first became aware of the condition of the chimney. *Cf.* Def. SOF 14, *with* Plf's. Resp. at 3. Nova reads Seeman's deposition as an admission that Wampler knew the chimney was leaning prior to the issuance of the Policy; WAM interprets Seeman and Wampler's testimony as proof that WAM was unaware

of any condition with the roof or chimney. Both parties find support for their positions in the deposition transcripts. But to credit one version of events over the other would require the Court to make a credibility determination, which it may not do at the summary judgment stage. *Gulino*, 971 N.E.2d at 528. Because a material issue of fact exists as to the cause of the loss and whether WAM was aware of the chimney's condition before the loss, Nova's motion for summary judgment must be denied on this ground. *Outboard Marine Corp.*, 154 Ill. 2d at 104; see also *Admiral Indem. Co. v. 899 Plymouth Court Condo. Ass'n D&kK Real Estate Serv. Corp.*, No. 16 C 5085, 2017 WL 345559, at \*8 (N.D. Ill. Jan. 24, 2017) ("The Court is unable to determine, and cannot appropriately determine at this juncture, when [plaintiff] first became aware of the water leaks causing damage to Unit G-02.").

*(3) Whether the Policy Exclusions for Loss or Damage Caused by Wear and Tear and Deterioration Preclude Coverage*

Next, Nova asserts that the Policy exclusions for loss or damage caused by wear and tear and deterioration bar coverage for WAM's claim. "An exclusion in an insurance policy serves the purpose of taking out persons or events otherwise included within the defined scope of coverage." *Rich v. Principal Life Ins. Co.*, 226 Ill. 2d 359, 379 (2007). Thus, Nova has the burden of establishing that an exclusion applies. *Santa's Best Craft, LLC v. St. Paul Fire & Marine Ins. Co.*, 611 F.3d 339, 347 (7th Cir. 2010).

*(a) The Policy*

The relevant provisions of the Policy, as cited by the parties, provide:

BUSINESSOWNERS COVERAGE FORM
* * *
**A. Coverage**
* * *
**5. Additional Coverages**
* * *
    **d. Collapse**
    The coverage provided under this Additional Coverage–Collapse applies only to an
    abrupt collapse as described and limited in Paragraphs d.(1) through d.(7).

13

(1) For purposes of this Additional Coverage – Collapse, abrupt collapse means an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended purpose.

(2) We will pay for direct physical loss or damage to Covered Property, caused by abrupt collapse of a building or any part of a building that is insured under this policy or that contains Covered Property insured under this policy, if such collapse is caused by one or more of the following:

(a) Building decay that is hidden from view, unless the presence of such decay is known to an insured prior to collapse;

(b) Insect or vermin damage that is hidden from view, unless the presence of such damage is known to an insured prior to collapse;

(c) Use of defective materials or methods in construction, remodeling or renovation if the abrupt collapse occurs during the course of construction, remodeling or renovation;

(d) Use of defective material or methods in construction, remodeling or renovation if the abrupt collapse occurs after the construction, remodeling or renovation is complete, but only if the collapse is caused in part by:

(i) A cause of loss listed in Paragraph (2)(a) or (2)(b);

(ii) One or more of the "specified causes of loss";

(iii) Breakage of building glass;

(iv) Weight of people or personal property; or

(v) Weight of rain that collects on a roof.

(3) This Additional Coverage – Collapse does not apply to:

(a) A building or any part of a building that is in danger of falling down or caving in;

(b) A part of a building that is standing, even if it has separated from another part of the building; or

(c) A building that is standing or any part of a building that is standing, even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

* * *

## B. Exclusions

1. We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss. These exclusions apply whether or not the loss event results in widespread damage or affects a substantial area.

* * *

### i. "Fungi", Wet Rot Or Dry Rot

Presence, growth, proliferation, spread or any activity of "fungi", wet rot or dry rot. But if "fungi", wet rot or dry rot result in a "specified cause of loss", we will pay for the loss or damage caused by that "specified cause of loss."

This exclusion does not apply:

(1) When "Fungi", wet rot or dry rot result from fire or lightning; or

(2) To the extent that coverage is provided in the Limited Coverage For "Fungi", Wet Rot Or Dry Rot Additional Coverage, with respect to loss or damage by a cause of loss other than fire or lightning.

* * *

### l. Other Types Of Loss

(1) Wear and tear;

(2) Rust or other corrosion, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself;

* * *

(4) Settling, cracking, shrinking or expansion;

* * *

2. We will not pay for loss or damage caused by or resulting from any of the following:
* * *
      **i. Collapse**
          (1) Collapse, including any of the following conditions of property or any part of the property:
               (a) An abrupt falling down or caving in;
               (b) Loss of structural integrity, including separation of parts of the property or property in danger of falling down or caving in; or
               (c) Any cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion as such condition relates to Paragraph i.(1)(a) or i.(1)(b).
          But if collapse results in a Covered Cause of Loss at the described premises, we will pay of the loss or damage caused by that Covered Cause of Loss.
* * *
      **l. Other Types of Loss**
          (1) Wear and tear;
          (2) Rust or corrosion, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself;
* * *
          (4) Settling, cracking, shrinking or expansion;
* * *
      **p. Continuous Or Repeated Seepage Or Leakage Of Water**
          Continuous or repeated seepage or leakage of water, or the presence or condensation of humidity, moisture, or vapor, that occurs over a period of 14 days or more.
* * *
3. We will not pay for loss or damage caused by or resulting from any of the following Paragraphs a. through c. But if an excluded clause of loss that is listed in Paragraphs a. through c. results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.
* * *
      **c. Negligent Work**
          Faulty inadequate or defective,
          (4) Maintenance;
          of part or all of any property on or off the described premises.

Doc. 19, at 9-13 (Def. SOF 52).

*(b) Whether the Loss was Caused by Wear and Tear or Deterioration*

Nova argues that "[t]he undisputed evidence establishes that the chimney had deteriorated and the roof exhibited wear and tear, which allowed water to enter the building over an extended period of time causing extensive deterioration." Doc. 19, at 17. In support, Nova claims that WAM's contractor inspected the chimney one year before the loss and opined that the chimney was deteriorated and "that water could enter the building through the roof because the roof 'wasn't in good shape.'" *Id.* at 18. However, Nova mischaracterizes Seeman's deposition testimony by inferring a temporal connection between Seeman's 2012 inspection of the chimney

and his post-lost inspection of the roof. Indeed, Nova points out as much in its reply brief, where it notes that Seeman testified that he never inspected the roof before the loss. See Doc. 29, at 4-5.

Nova performed two post-loss inspections of the building—one approximately a week after the April 19, 2013 collapse, and one on May 28, 2013. Doc. 19, at 6. From the record, it is unclear whether Seeman was at both inspections and whether his testimony relates to his observations at the first or second inspection. In any event, a genuine dispute remains as to whether WAM had knowledge of the roof's condition prior to the loss, and Nova never inspected the property until after the collapse occurred. Moreover, the parties generally agree that chimney fell and caused damage to the roof. With no pre-loss inspection, damage to the roof caused by the chimney collapse, and the passage of time between the collapse and the post-loss inspections where the building was exposed to the elements, it is unclear whether the condition of the building as observed in the post-loss inspection is fairly traceable to the condition of the building before the collapse. Therefore, viewed in the light most favorable to WAM, a genuine dispute of fact exists as to the condition of the roof *before* the collapse.

Nova also cites to a case from Michigan that dealt with wear and tear and deterioration exclusions. *McCartha v. State Farm Fire & Cas. Co.*, 2016 WL 4375659 (Mich. Ct. App. 2016). In *McCartha*, the insured submitted a claim for coverage after a tree allegedly fell and damaged the insured's roof. After his claim was denied, he brought suit against the insurer. The *insured's* expert inspected the roof *before* the loss to provide quotes on replacement costs and testified that the roof was in poor condition, shingles were missing entirely, and there was a hole in the roof. *Id*. at *3. He further testified that, six months prior to the loss, the roof needed to be replaced immediately, and there was a hole in the ceiling over plaintiff's bedroom. The insurer's expert

also testified that the roof was worn and severely deteriorated. *Id.* at 4. The trial court granted

summary judgment in favor of the insurer, and the appellate court affirmed, reasoning:

> On the evidence presented, it is undisputed that the poor and deteriorated condition of plaintiff's roof was evident months before the tree limb fell and there is no evidence, only mere speculation, that the claimed damage to the roof was caused by the fallen tree limb. Accordingly, there is no genuine issue of material fact that the claimed damage falls squarely within the policy exclusion expressly excluding coverage for loss consisting of wear, tear, or deterioration. "Coverage under a policy is lost if any exclusion within the policy applies to a particular claim." *Allstate Ins. Co. v. Keillor (After Remand),* 450 Mich. 412, 420, 537 N.W.2d 589 (1995). The exclusion also precluded coverage for the interior water damage as a direct and immediate result of the deterioration of the roof, regardless of whether the loss occurred suddenly or gradually.

> *McCartha v. State Farm Fire & Cas. Co.*, No. 326689, 2016 WL 4375659, at *4 (Mich. Ct. App. Aug. 16, 2016).

As previously mentioned, WAM's case is unlike *Johnson Press*, where plaintiff's own

expert admitted that the loss was caused by an excluded peril. Thus, *McCartha*, where plaintiff's

own expert admitted that he *personally observed the premises before the alleged loss* and

admitted that the loss was caused by a separate, excluded peril, is even further afield. In contrast

to *McCartha*, material disputes of fact exist as to the condition of the building at the time of the

loss, the cause of the loss, and if WAM had knowledge of the chimney's condition prior to the

loss.

### *(c) The Additional Coverage Provided an Exception to the Decay Exclusion*

Insurance policies are "to be construed as a whole, giving effect to every provision, if

possible, because it must be assumed that every provision was intended to serve a purpose."

*Stoneridge Dev. Co. v. Essex Ins. Co.*, 382 Ill. App. 3d 731, 748-49 (2008). Here, Nova's basic

Policy specifically excludes damage caused by collapse, as well as damage caused by "[r]ust or

other corrosion, decay, deterioration, hidden or latent defect or any quality in property that

causes it to damage or destroy itself." Doc. 19, at 12. However, WAM purchased additional

coverage for collapse. Under the "Additional Coverage—Collapse" provision of the Policy, coverage is provided for collapse caused by, *inter alia*, "[b]uilding decay that is hidden from view, unless the presence of such decay is known to an insured prior to collapse." Doc. 19, at 10. In other words, while losses caused by "corrosion, decay, deterioration …" are excluded from coverage under the basic Policy, the additional coverage purchased by WAM carves back this exclusion by making an exception for "[b]uilding decay that is hidden from view, unless the presence of such decay is known to an insured prior to collapse." Thus, even if the roof or chimney exhibited severe decay, the additional coverage would cover a collapse caused by hidden roof and chimney decay so long as the decay was not known to WAM prior to the collapse.[6] As discussed in detail above, WAM's alleged knowledge of the chimney or roof decay is a disputed material fact.

 *(4) Whether WAM's Claim is Barred by the Faulty Maintenance Exclusion*

Next, Nova asserts that "the undisputed evidence establishes that the damage to the Premises resulted from WAM's failure to perform any maintenance on the east building." Because material issues of fact exist regarding the cause of the loss, the condition of the building prior to the collapse, and WAM's knowledge of those conditions, summary judgment is inappropriate on this ground as well.

*(5) WAM's Claim for Damages under Section 155 of the Illinois Insurance Code*

Under Section 155 of the Illinois Insurance Code, the Court may award attorneys fees and costs if an insurers' actions are "vexatious and unreasonable." 215 ILCS 5/155. "Attorneys fees may not be awarded simply because an insurer takes an unsuccessful position in litigation, but only where the evidence shows that the insurer's behavior was willful and without reasonable

---

[6] Neither party attempts to define "decay" or distinguish it from "corrosion" or "deterioration." Nor do they explain whose view the decay must be hidden from.

cause." *Citizens First Nat. Bank of Princeton v. Cincinnati Ins. Co.*, 200 F.3d 1102, 1110 (7th Cir. 2000). "An insurer's conduct is not vexatious and unreasonable if: (1) there is a bona fide dispute concerning the scope and application of insurance coverage; (2) the insurer asserts a legitimate policy defense; (3) the claim presents a genuine legal or factual issue regarding coverage; or (4) the insurer takes a reasonable legal position on an unsettled issue of law. *Citizens First Nat. Bank of Princeton*, 200 F.3d at 1110 (internal citations omitted).

Here, Nova's actions were not vexatious or unreasonable because WAM's claim presents genuine factual issues regarding coverage. Nova immediately began investigating the claim and inspected the property a week after the collapse. Further, Nova's expert reexamined the property a month later and supplemented his report to address concerns raised by WAM and its adjustor. Although WAM insists that "the vexatious and unreasonable nature of Nova Casualty Company's handling of WAMFAM5's claim is clearly a question to be determined by the trier of fact," Doc. 24, at 18, the plain text of the statute clearly vests the courts with that discretion. See 215 ICLS 5/155 ("In any action … wherein there is in issue the liability of a company on a policy or policies of insurance or the amount of the loss payable thereunder, or for an unreasonable delay in settling a claim, and it appears *to the court* that such action or delay is vexatious and unreasonable, *the court* may allow as part of the taxable costs in the action reasonable attorney fees …") (emphasis added). Accordingly, Nova is entitled to summary judgment in its favor on WAM's claim for damages under Section 155 of the Illinois Insurance Code.

*(6) Nova's Motion to Bar Dale Peek from Providing Expert Opinions*

Nova also moves for sanctions under Fed. R. Civ. P. 37(c) to bar Dale Peek from providing any purported expert opinions. See Doc. 25. Specifically, Nova asserts that WAM failed to disclose Peek as an expert under Rule 26(a)(2); Peek never provided a written report

under Rule 26(a)(2); and WAM's failure to disclose Peek's opinions prejudiced Nova because it never had the opportunity to depose him with respect to his purported expert opinions, which were not disclosed until WAM's response to Nova's motion for summary judgment. Nova further asserts that WAM's violation of Rule 26(a) was neither justified nor harmless; therefore, WAM should be barred from presenting Dale Peek or any other purported expert's opinions in this case.

Nova also asserts that, even if WAM had properly identified and disclosed Peek as an expert, he should nevertheless be barred because he is not qualified to determine the cause of the collapse of the east building or provide expert opinions regarding the underwriting policies. Specifically, Nova takes issue with the following responses to Nova's Motion for Summary Judgment:

> 29. Dale Peek could also not be certain whether water in the east building's basement resulted from the occurrence at issue or was a pre-existing condition.

> 36-42. Dale Peek could not be certain whether water in the east building's basement resulted from the occurrence or was a preexisting condition.

> 43-44. Dale Peek has offered the opinion that the occurrence at issue in this matter was caused entirely by an April 19, 2013 storm … ("My belief is that the windstorm and follow-up water from that storm of April 19 impacted this loss substantially and caused the collapse of the second floor by blowing over the chimney, which then opened up a gaping hole in the roof that brought the water to come to that rear section of the building and then started channeling down the second floor.")

> 45-46. Dale Peek could not be certain whether water in the east building's basement resulted from the occurrence or was a preexisting condition.

WAM also asserted in its Additional Material Facts:

> 1. Dale Peek averred in his deposition that he believed that WAMFAM5 had a viable claim with Nova Casualty Company for the loss at issue. Indeed, Dale Peek felt that Nova Casualty Company's rationale for denying WAMFAM5's claim had been "out of line."
> 2. Dale Peek believed that Nova Casualty Company would have inspected the buildings at issue prior to the loss as a precondition to insuring the property.

The Court finds that the statements in paragraphs 29, 36-42, and 45-46 are admissible as lay opinions under Federal Rule of Evidence 701. Rule 701 provides:

> If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:
> **(a)** rationally based on the witness's perception;
> **(b)** helpful to clearly understanding the witness's testimony or to determining a fact in issue; and
> **(c)** not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

> Fed. R. Evid. 701.

Here, Peek's testimony—that he was unsure whether water was in the basement prior to the collapse—is not even an opinion, let alone an expert opinion. See Doc. 24-3, at 98-101. Assuming that WAM's responses in paragraphs 43-44 are undisclosed expert opinions and that Peek is not qualified to offer said opinions, Nova would still not be entitled to summary judgment on the breach of contract claim because a material dispute of fact exists as to the cause of the collapse. Finally, because Nova is entitled to summary judgment in its favor on WAM's claim for damages under 215 ICLS 5/155, Nova's objections to WAM's statement of additional material facts appears to be moot. Accordingly, Nova's motion for sanctions and to bar Peek's purported expert opinions is denied at this time. Nova may renew its challenge to Peek's expected testimony by filing a motion *in limine* before trial.

*(7) Nova's Motion to Strike WAM's Responses to Various Statements of Fact*

Nova also moves to strike several of WAM's responses to Nova's statements of fact on the basis that they contain inadmissible hearsay. Specifically, Nova objects to the following responses:

> 12. At the conclusion of the inspection, WAMFAM5's president, Larry Wampler, was advised that "the roof[s]…were fine."
> 14. WAMFAM5's contractor, Kent Seeman, was uncertain as to whether Larry Wampler knew the east building's chimney was leaning.

17. Larry Wampler was advised by Kent Seeman that the east building's chimney was fine.

28. Larry Wampler informed WAMFAM5's retained public adjustor, Dale Peek, that he believed that the east building had been "holding its position" prior to the April 19, 2013 occurrence.

29. Dale Peek further testified that, prior to the loss, Larry Wampler believed the east building to be structurally sound.

36-42. At the conclusion of the inspection, Larry Wampler was advised that "the roof[s]…[were] fine."

45-46. At the conclusion of the inspection, Larry Wampler was advised that "the roof[s]…[were] fine."

Doc. 28, at 2-3.

"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009) (citing Fed. R. Evid. 801(c), *United States v. Harris*, 281 F.3d 667, 671 (7th Cir. 2002)). "[H]earsay is inadmissible in summary judgment proceedings to the same extent that it is inadmissible in a trial … except that affidavits and depositions, which (especially affidavits) are generally not admissible at trial, are admissible in summary judgment proceedings to establish the truth of what is attested or deposed … provided, of course, that the affiant's or deponent's testimony would be admissible if he were testifying live." *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997) (citing Fed. R. Civ. P. 56(c), (e); *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 921 (7th Cir. 1994)) (internal citations omitted).

Here, the statements contained in paragraphs 12, 17, 36-42, and 45-46 all relate to purported statements by Kent Seeman to Larry Wampler regarding the condition of the roof and chimney prior to the loss and therefore go to the issue of notice.

Similarly, Paragraph 14 contains a statement made by Seeman during his deposition regarding whether Wampler knew of the chimney's condition. WAM asserts that these statements are admissible because Nova had the opportunity cross-examine Seeman regarding the

statements made to Wampler during the course of Seeman's deposition. WAM also asserts that it is offering the statements conveyed to Wampler, as WAM's party representative, to explain actions taken by Wampler as it relates to maintenance issues with the building. WAM further states that the statement in paragraph 14 relates to Seeman's mental impression about what Wampler knew, and is therefore not offered for the truth of the matter asserted, but rather goes to Wampler's state of mind. Paragraph 28 contains a statement Wampler made to Peek regarding Wampler's belief that the building was stable prior to the loss. Paragraph 29 contains a statement Peek made about Wampler's belief that the building was stable. WAM asserts that these statements are not hearsay because Nova had the opportunity to cross examine Wampler and Peek regarding these statements, Peek's statements are admissible as a corporate party representative and party agent.

Here the Court has reviewed the above statements and has determined as presented that they would be admissible on the issues of notice and state of mind. The parties remain free to make appropriate objections at trial if they believe otherwise.

## CONCLUSION

For the reasons stated above, Defendant's Motion [19] for Summary Judgment is GRANTED IN PART AND DENIED IN PART, Defendant's Motion [25] for Sanctions is DENIED, and Defendant's Motion [27] to Strike is DENIED


Signed on this 21st day of March, 2017.

s/ James E. Shadid
James E. Shadid
Chief United States District Judge